### IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

### CENTRAL DIVISION

| | |
|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** | **MEMORANDUM DECISION AND ORDER** |
| **Plaintiff,** | **Case No.  2:10CV955DAK** |
| **vs.** | **Judge Dale A. Kimball** |
| **HOLMES & HOLMES INDUSTRIAL, INC.,** | |
| **Defendant.** | |
| **JOBY BRATCHER and ANTONIO BRATCHER,** | |
| **Plaintiffs in Intervention,** | |
| **vs.** | |
| **H3GROUP, INC., HOLMES & HOLMES, INDUSTRIAL, INC., MICHAEL H. HOLMES, RON K. HOLMES, PAUL FACER,** | |
| **Defendants in Intervention.** | |

This matter is before the court on Plaintiff Equal Employment Opportunity Commission's ("EEOC") Motion for Partial Summary Judgment, Defendants H3Group, Inc, Holmes & Holmes Industrial, Inc., Michael H. Holmes and Ron K. Holmes's ("Holmes Defendants") Motion for Sanctions, and the Holmes Defendants' Motion in Limine Regarding Plaintiffs' Music Lyrics and

Videos.[1]  On September 5, 2012, the court held a hearing on the motions.  At the hearing,

Plaintiff was represented by Richard Sexton, Hillary K. Valderrama, and Amy Oliver, the

Holmes Defendants were represented by Robert S. Gurney and Ruth A. Shapiro, and Defendant

Paul Facer was represented by Zachary E. Peterson.  Edward B. Havas appeared on behalf of his

brother David B. Havas, counsel for Plaintiffs in Intervention, to notify the court of the recent

death of David B. Havas.  He provided the court with a Notice of Death and informed the court

that new counsel for Plaintiffs in Intervention, Lauren I. Scholnick, was present and would be

entering an appearance in the case shortly.  After hearing oral argument, the court took the

motions under advisement.  The court has carefully considered the pleadings, memoranda, and

exhibits submitted by the parties, as well as the law and facts relevant to the pending motions.

Now being fully advised, the court renders the following Memorandum Decision and Order.

## BACKGROUND

Holmes & Holmes Industrial, Inc. ("Holmes") is a construction company that performs

excavation, concrete, and pipe welding services throughout the State of Utah.  On September 28,

2010, Plaintiff EEOC filed a Complaint against Holmes, alleging, inter alia,  racial

discrimination and retaliation pursuant to § 703 of Title VII and § 704 of Title VII, respectively.

Ron and Mike Holmes are the owners of Holmes.  Ron and Mike Holmes are both white.

Holmes hired James Buie as a concrete finisher in December 2005 and he worked at Holmes in

that capacity until early 2007.  In March 2006, Holmes hired Antonio Bratcher as a fire watch

---

[1]  Defendant Paul Facer has joined in the Holmes Defendants' motion for sanctions and motion in limine regarding music lyrics and videos, see docket nos. 92 and 93.  The motions for joinder in Defendants' motions are granted.  However, to the extent that Facer has asserted additional substantive arguments in relation to Defendants' Motion for Sanctions, the court will address such arguments below.

employee.  Shortly thereafter, in April 2006, Holmes hired Antonio's younger brother, Joby

Bratcher, as a fire watch employee.  The Bratchers worked at Holmes between March/April 2006

to August 20, 2008.   Buie and the Bratchers are African Americans.  Buie and the Bratchers

spent most of their employment working on the Chevron site.

      Paul Facer was the Superintendent/Project Manager for Holmes at the Chevron job site

during the relevant times.  As such, he was the highest ranking official at the job site.  Facer is

white. Facer had immediate (or successively higher authority) over the Bratchers and Buie while

they were working on the Chevron site during the relevant times.

      In early spring of 2008, Dale Arrington, a white man, was the Human Resources Manager

for Holmes.  Arrington was Holmes' entire human resources department.  Prior to early spring of

2008, Holmes did not have a formal human resources department. As Holmes' Human Resources

Manager, Arrington was responsible for enforcing Holmes' harassment policy.

      During a safety meeting Arrington was conducting for all Holmes employees, he "told the

guys not to nigger rig their jobs."  Arrington admitted that he used the term "nigger rigging" to

refer to work that was done poorly or incorrectly.  This comment was made in front of all

Holmes employees, including three African-American employees, the Bratchers and Buie.

      After hearing this comment, Buie became visibly upset and stormed out of the meeting.

The Bratchers were also upset and offended by Mr. Arrington"s "nigger rigging" comment.  The

Bratchers complained to Shad Pixton, a pipefitter who supervised small crews, about Dale

Arrington's use of the phrase "nigger rigging" during the safety meeting.  The Bratchers were

extremely upset about the racial comment, and told Mr. Pixton that they thought it was a slur.

The Bratchers also complained to Jesse Gehrke, a pipe fitter, about the "nigger rigging" comment

and were pretty upset.  The Bratchers were complaining about the "nigger rigging" comment all

day and were upset for the entire day.

Facer and other white supervisory staff members (including Ross Barker and Kelvin "Shad" Pixton) were present at the meeting where Arrington used the phrase "nigger rigging." There was no investigation into Arrington's "nigger rigging" comment. Arrington was not given a written reprimand, or suspended for making the "nigger rigging" comment. Arrington told Ron Holmes about the comment and admitted that he had screwed up. Holmes told him not to use the term again and to apologize to the Bratchers and Buie. Holmes asserts that this constituted a verbal reprimand whereas the EEOC contends that no disciplinary action was taken.

Ron Holmes admitted that Arrington's use of the phrase "nigger rigging" in the safety meeting was both inappropriate and a violation of Holmes' harassment policy. Arrington also admitted that the comment was offensive, hurtful, and "absolutely inappropriate." Arrington admitted that a reasonable African-American who heard the "nigger rigging" comment might be offended. Despite this, Arrington did not apologize to the entire group of employees, nor did he tell employees that his comment at the safety meeting was inappropriate in the workplace.

About April 26, 2006, Antonio Bratcher was in a van with other Holmes employees being transported to the work site when a supervisor Scott (A.K.A. "Tiny") Pixton, who is white, said "I'm not listening to this nigger jig." This comment was made in reference to rap music that was playing in the van. Antonio was the only African-American in the van. Antonio was upset that someone actually used the word "nigger" on a job site in his presence. On the same day, before Antonio complained about this incident, Pixton approached Antonio and said "I can see your feelings are hurt, but there is a difference between Niggers and blacks, Mexicans and spics, but I see you as a black man."

When the van arrived at the work site, another supervisor, Clayton Firth, who is white,

told Antonio that Scott had told him what happened and asked Antonio if he needed to take the day off.  Antonio responded that he was not going to lose money over someone's stupidity.

That same day, Antonio complained, in writing, about the incident in the van where supervisor Pixton used the word "nigger."  As required by Holmes' anti-harassment policy, Antonio gave his complaint to his supervisor, Clayton Firth.  In his written complaint, Antonio clearly stated that he was offended by Pixton's use of the word "nigger" and that he wanted appropriate measures to be taken to ensure that type of incident did not happen to another person of color.

Despite the fact that Antonio complained to his supervisor as required by Holmes' anti-harassment policy, neither the owners nor the human resources manager ever received notice of this incident. There was no investigation into the incident in the van or Antonio's written complaint.  No disciplinary action was taken with respect to Scott Pixton's use of the word "nigger."

During the Bratchers' two-and-a-half year employment with Holmes, Superintendent/Project Manager Facer repeatedly addressed them using the words "nigger" or "nigga."  Facer admitted that he "used [the word "nigger"] a lot with Joby and Antonio."  In fact, Facer admitted that he referred to the Bratchers as "nigger" or "nigga" almost every time he saw them.  Facer admitted that he used the word "nigger" or "nigga" at least 3-4 times per week during his employment with Holmes.

Facer further admitted that he made racial "jokes" at least once a week during his employment with Holmes.  These racial "jokes" had to do with black people or other ethnic groups.  Facer admitted that it is possible that he used the word "nigger" in some of these "jokes."  Facer told at least the following "jokes" in the Bratchers" presence: (1) "what do

niggers call a white person on the job site? Boss;" (2) "what are niggers most scared of? White sheets;" (3) "why don't niggers like trees? Because they are used to hanging from them;" (4) "what do you call a KKK barbeque? A nigger roast;" and (5) "do you know how nigger babies are here on earth? God takes bats and rips the tails off of them and sends them down here."

Facer admitted that he refers to his nose as a "nigger nose" and admitted that it was possible that he referred to his nose as a "nigger nose" at the work site.  Facer stated that he refers to his nose as a "nigger nose" because it is wide.  Facer also admitted that it is possible that he used the term "monkey" to refer to Joby or Antonio Bratcher.

During a ten minute smoke break, Steve Endo, an Asian American Holmes supervisor, witnessed Facer using the word "nigger quite a bit" in front of the Bratchers.  According to Endo, during that ten minute conversation, Facer used the word "nigger" at least five or six times. Facer was talking about a boating trip and described Antonio and Joby by using the word "nigger."  Endo could see that Facer's use of the word "nigger" affected Antonio and Joby.  Endo could tell that Antonio and Joby were offended by Facer's repeated use of the word "nigger."

Ron and Mike Holmes, the owners of Holmes, both admit they would not be surprised to learn that Facer was using the word "nigger" loosely at the work site. Ron Holmes also admits that he would not be surprised if he heard that Paul Facer was using the word "nigger" three to four times a week, or any other ethnic slur, between January 2006 and August 2008.  Given the frequency that Ron Holmes was on site, he admits he should have known about Facer using the word nigger or any other ethnic slur.  No Holmes employee ever asked Antonio or Joby Bratcher whether they were offended by Facer's conduct.

Another Holmes supervisor, Paul Fail, admitted that "everybody would laugh" and crack "nigger jokes, or Indian jokes, or Polish jokes" on the Holmes site.  Fail admitted that he heard

several people at the work site use the term "nigger rigging" as well as using it himself while

working for Holmes.

Another employee, Craig Schade, who is white, told James Buie he looked like black

gnome (i.e., a black lawn statue or iron jockey).  Buie was offended and upset by this racial

comment.   Schade justified his remarks by stating to Buie that "in Hawaii, people make fun of

each other's race all the time to their face, and it's not considered bad manners."  The Bratchers

and Buie testified that the harassment they endured made it harder for them to go to work each

day.

In addition to the verbal harassment, the portable toilets on Holmes' work site contained

racist graffiti.  For example, Joby Bratcher saw the words "all niggers are dirty" written on the

portable toilets.  Ross Barker also admitted that it was not uncommon to see racial terms or

drawings in the portable toilets.  Barker stated that this racial graffiti could be "everything you

can imagine and probably things you can"t imagine."  Barker explained that the racial graffiti

"could refer to anyone of any race, and did."  Barker specifically admitted that he had seen the

word "nigger" in the portable toilets.  Holmes' owner Ron Holmes also admitted that there was

graffiti both inside and outside the portable toilets.

Holmes' Harassment/Sexual Harassment Policy ("Policy") does not specifically mention

racial harassment.  Instead, it makes a vague reference to members of a "protected group," with

no effort to explain the composition of that "protected group."  Ron Holmes admitted that the use

of the word "nigger" on the work site constituted a violation of Holmes' harassment policy.

Holmes' Policy states that "[i]f an individual feels he/she has experienced or witnessed

harassment, he/she is to immediately notify his/her supervisor."  Holmes' Policy does not

provide an alternative contact if the supervisor is the harasser.

During the relevant time period, 2006 to 2008, Holmes did not provide specific training on the Policy.  Out of the twenty three current and former employees that were deposed, the vast majority admitted that they never had any training on any type of anti-harassment policy or discrimination laws while working for Holmes.

Sometime in 2007, Joby Bratcher complained to Ron Holmes about Facer's use of racial slurs.  Around March of 2007, Antonio Bratcher complained to Ron Holmes about the job assignments Facer was giving him.  Antonio also complained about the way Facer was treating him.  Immediately after this meeting, Facer approached Joby and said "Antonio is trying to get me in trouble for this nigger shit."   After Antonio's complaint in March 2007, the racial harassment stopped for one to two weeks, but then Facer went back to using racial slurs, such as calling them "niggers."

In the fall of 2007, Antonio complained to Don Brady, a white Chevron employee at the job site, about the racial harassment at Holmes.  Antonio told Brady that he was pretty upset that someone called him the "N-word" in front of the whole group in a morning meeting.  Another white employee of Holmes also complained to Don Brady about the racial harassment.  In or around November or December of 2007, the Bratchers complained to Holmes supervisor Steve Endo about being subjected to racial harassment by  Facer.  The Bratchers told Endo that they were offended by Facer's racial comments.

Joby complained to Ron Holmes about Facer's harassment in April 2008, referring to Facer's use of the term "nigger" and the racial jokes.  Ron Holmes admitted that when Joby complained he got the impression that Joby found Facer's harassment offensive, that Joby was upset, and that Joby just wanted the harassment to stop.  Following Joby Bratcher's complaint in 2008, Ron Holmes asked Facer to be more professional.  Although Holmes' characterized the

conversation as a verbal reprimand, during this conversation, there is no evidence that Ron

mentioned anything about the Bratchers, Buie, or racial slurs.

On at least one occasion, the Bratchers complained to Kyle Doman, a pipefitter welder

helper, that they were offended by Facer's racial "jokes."  Kyle Doman, who is white, confirmed

that the Bratchers did seem upset or offended some of the times when Paul Facer would refer to

them using the word "nigger" or "nigga."  In or around July 2008, PJ Facer, Paul Facer's son,

made a joke to Antonio and Joby about a "nigger nose."  The Bratchers told PJ Facer that his use

of the term "nigger nose" was unacceptable and that they were offended by it.

In or around the summer of 2008, Antonio and Joby complained to Elizabeth Vargas, a

Hispanic fire watch employee, about a racist comment that was broadcasted over the hand-held

radio.  According to Vargas, everybody, including supervisors, can hear what is broadcasted

across the hand-held radios.  She testified that Antonio was "really mad" about the racial

comment over the radio.

Antonio and Joby also complained or made comments to Natalie Davis, a white fire

watch employee, indicating that they were upset about and offended by Facer's racial comments

and repeated use of the word "nigger" or "nigga."  The Bratchers would make comments to

Davis such as: "why is he doing that?"; "does he think it's okay?"; and "does he think it's cool to

do that because it's not?".  Davis testified that she felt uncomfortable when Facer would use the

word "nigger" or "nigga."  Other employees also reported that the use of racial slurs and/or jokes

made them uncomfortable, offended them, or was inappropriate.

The Bratchers again complained about racial harassment to Ron and Mike Holmes, as

well as Dale Arrington and Lance Thorup, on August 20, 2008.  During the August 20, 2008

meeting, the Bratchers explained that the racial harassment had not stopped and they felt that the

company was condoning Facer's actions.  Prior to August 20, 2008, there was never an investigation into any of the Bratchers' complaints of racial harassment.  The alleged investigation conducted that day, however, was interrupted because Chevron revoked Holmes' contract.  The alleged investigation consisted of Dale Arrington talking to several individuals about drug use and racial discrimination.  Arrington admitted that he only talked to Natalie Davis, the one person who said she had witnessed Facer using the word "nigger" towards Antonio and Joby, for three minutes. No one did any follow-up interviews with Natalie Davis. Arrington never spoke with Facer about any of the Bratchers' allegations as part of the alleged investigation.

Holmes' alleged investigation revealed that the Bratchers had been racially harassed. Holmes states that it issued Facer a 30-day written "corrective action" for drug use and use of racial slurs on August 21, 2008.  However, the document has no signature by either Ron or Mike Holmes or  Facer.  Facer said he never received or signed this alleged corrective action. However, Arrington testified that he knows there is a signed corrective action somewhere.

Prior to August 21, 2008, Facer had never been disciplined for racial harassment.  Prior to August 21, 2008, no one talked to Facer about racial harassment or racial slurs.  Prior to August 21, 2008, Ron and Mike Holmes admitted that Facer was never issued a written discipline for his use of racial slurs at the workplace.

On August 20, 2008, Chevron ordered that all Holmes employees be drug tested.  Facer refused to take a drug test and "self-terminated" his employment with Holmes as of August 20, 2008.  Ron Holmes admitted that if Facer had not refused to take the drug test on or about August 21, 2008, Facer would have remained employed with Holmes and continued to have been paid his regular salary during the period of the 30-day corrective action.  He also testified,

10

however, that Facer would have been on a "very tight string" and that may have included Arrington supervising his conduct.

The Bratchers were terminated on or about August 20, 2008, the day they met with Ron and Mike Holmes to complain about the ongoing racial harassment. Job Bratcher refused to take a drug test and self-terminated. Antonio Bratcher was laid off with other employees because of a lack of work.

After Facer's refusal to take the drug test and his "self-termination" of employment, Holmes issued him a written 120-day "corrective action." The corrective action placed Facer on suspension for 120 days for refusing the drug test. Holmes asserts that it was also for the racial slurs. Facer returned to work for Holmes on or about December 15, 2008. Upon Facer's return on December 15, 2008, there was no further investigation into the allegations of racial harassment. Facer was not given a job as a superintendent and was paid $15 per hour less than he had been paid previously. It is unclear whether any of this was in relation to the alleged racial harassment. Facer worked for Holmes until November of 2009, when he was laid off as part of a reduction in force.

Holmes contends that Facer and the Bratchers were friends and that the Bratchers also used the term "nigga" in conversation at the work site. Holmes points to the fact that one of the Bratchers attended a birthday party for Facer's daughter as evidence that they were friends. However, Bratcher asserts that he went to the party only because his wife thought it might facilitate a better relationship with Facer.

Holmes also claims that Facer attended a music video the Bratchers' filmed and his attendance demonstrates a friendship between the men. The Bratchers dispute whether they specifically invited Facer to anything. The Bratchers testified that they did not consider Facer to

be a friend.  Holmes also points out that the Bratchers were musicians and they would bring their music to the work site.  The rap music they sang contained the term "nigga" in several places. Holmes argues that the music made the other employees feel as through they could use the terms they used around the Bratchers.  The Bratchers, however, contend that no employee testified that they heard the term "nigga" in any of their music.

### DISCUSSION

### EEOC's Motion for Partial Summary Judgment

**A.  Hostile Environment Claim**

The EEOC moves for partial summary judgment on the issue of whether the Bratchers and Buie were subjected to a hostile work environment due to the almost daily use of the word "nigger" or "nigga" by the highest ranking supervisor on site.  There is no dispute about the fact that Facer referred to the Bratchers and Buie using these terms almost every time he spoke to them and that he told racial jokes frequently.  Defendants contend, however, that Facer did not intend to create a hostile environment, the Bratchers also participated in the conduct and used racial slurs, and an alleged friendship between the parties negates a finding that the conduct was subjectively offensive.

A hostile work environment exists if the workplace is "permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of [the Bratchers' and Buie's] employment and create an abusive working environment." *Tademy v. Un. Pac. Corp.*, 614 F.3d 1132, 1144 (10th Cir. 2008) (quoting *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007)).  It is well settled that "[p]ervasiveness and severity are independent and equal grounds upon which a plaintiff may establish this element of a hostile environment." *Tademy*, 614 F.3d at 1144 (citation and internal quotations omitted).  "[A]

12

sufficiently severe episode may occur as rarely as once . . . , while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute." *Id*. (citations omitted). The court can consider whether the conduct is frequent or severe; whether it is physically threatening or humiliating, or merely offensive utterances; and whether it unreasonably interferes with the employee's work performance. *Id*. (citing *Harsco Corp. v. Renner*, 475 F.3d 1179, 1187 (10th Cir. 2007)). The harassment must also be racial or stem from racial animus. *Bolden v. PRC Inc.*, 43 F.3d 546, 551 (10th Cir. 1995).

In making the determination of whether an environment is truly hostile, courts consider the work atmosphere both objectively and subjectively, looking at all the circumstances from the perspective of a reasonable person in the plaintiff's position as well as the plaintiff's own perspective. *Tademy*, 614 F.3d at 1144. Defendants assert that summary judgment on this issue is inappropriate because the Tenth Circuit has found that whether a hostile work environment exists involves quintessential questions of fact. *Tademy*, 614 F.3d at 1144.

### 1. Objectively Hostile Environment

On the issue of whether the conduct objectively created a hostile work environment, the undisputed evidence establishes that the environment was dominated by racial slurs and epithets during the Bratchers' and Buie's entire employment with Holmes. Antonio Bratcher started working for Holmes in or around March 2006. The first incident of racial harassment happened less than two months after his start date when a white supervisor said, "I'm not listening to this nigger jig." Antonio was the only African-American in the van and was upset that a supervisor would use the word "nigger" in his presence and on the job. The evidence is also undisputed and uncontradicted that Facer, a supervisor and most senior employee on the Chevron work site, addressed the Bratchers as "nigger" or "nigga" on an almost daily basis. Facer admitted that he

"used nigger a lot with Joby and Antonio."  Facer also admitted that he referred to the Bratchers as "nigger" or "nigga" every time he saw them, which was usually every day.

The Tenth Circuit has clarified that there is certain conduct that is "constitutionally offensive in any setting." *Nieto v. Kapoor*, 268 F.3d 1208, 1218 n.6 (10th Cir. 2001) (emphasis added) (rejecting defendant's argument that the working environment at issue was "merely unpleasant" under *Gross* and finding harassment sufficiently severe and pervasive to constitute a hostile work environment).  The *Gross* court observed that an individual subjected to "a steady stream of vulgar and offensive epithets because of" a protected basis could establish a claim for a hostile work environment under Title VII.  *Gross*, 53 F.3d at 1539 (citation omitted).

The conduct at issue in this case constituted a "steady barrage of opprobrious racial comments" toward or around the Bratchers and Buie.  *See Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1412–13 (10th Cir. 1987).  During the relevant time period,  Facer used the word "nigger" or "nigga" almost daily, or at least three to four times per week.  Assuming that the Bratchers and Buie worked an average of forty-eight weeks a year, it would mean that Facer used the word "nigger" or "nigga" at the work site at least one-hundred forty-four times per year.

Courts around the country, including the Tenth Circuit, have repeatedly held that "[f]ar more than a mere offensive utterance, the word 'nigger' is pure anathema to African-Americans." *See Tademy*, 614 F.3d at 1145 (quoting *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001)). "Perhaps no single act can more quickly . . . create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger.'" *Tademy*, 614 F.3d at 1145 (citation omitted).

There is also undisputed evidence that Facer told several racially offensive jokes and referred to his nose as a "nigger nose."  Several co-employees testified that they witnessed these

14

events as well.  They also testified that they felt uncomfortable with Facer's conduct and that they knew the Bratchers were offended.  There is also evidence of racial slurs written in the porta potties.  Several employees and the owners recognized that the graffiti was on the inside and outside of the porta potties.

The conduct here is constitutionally offensive in any setting.  Here, the Bratchers and Buie were subject to racial slurs and epithets almost daily, including a daily barrage of the word "nigger" or "nigga."  "It is beyond question that the use of the word "nigger" is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination. This word is "perhaps the most offensive and inflammatory racial slur in English, . . . a word expressive of racial hatred and bigotry." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004) (quoting *Swinton v. Potomac Corp.,* 270 F.3d 764, 817 (9th Cir. 2001)). No reasonable jury could conclude that a reasonable African-American would not be offended, even in a blue collar setting, by the daily use of the word "nigger" and other racial jokes/comments by white supervisors.

This is not a case of "simple teasing, offhand comments, and isolated incidents." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  The Bratchers and Buie complained on several occasions about the conduct.  Around March of 2007, Antonio Bratcher complained to Ron Holmes about the job assignments Facer was giving him and about the way Facer was treating him.  Immediately after this meeting, Facer approached Joby and said "Antonio is trying to get me in trouble for this nigger shit."  After Antonio's complaint in March 2007, the racial harassment stopped for one to two weeks, but then Facer went back to using racial slurs.

Nonetheless, Defendants assert that the conduct did not alter the conditions of the Bratchers' and Buie's employment.  Defendants claim that there is evidence that the conduct did

not unreasonably interfere with the Plaintiffs' performance while employed at Holmes &

Holmes.  Several employees testified that Plaintiffs were good workers with good attitudes who

did not struggle to perform.  During the time of the conduct in question, Plaintiffs were promoted

and received pay increases.  Title VII, however, does not require a victim's work performance to

suffer.  The fact that Plaintiffs continued to be good workers in the face of the insults is not the

test for finding a hostile environment.  The test is whether the working conditions have been

"discriminatorily altered."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 24 (1993) (Scalia, J.,

concurring). Although Plaintiffs were hard workers, it is undisputed that the harassment made it

harder for them to go to work each day merely because of their race.

     In addition, Title VII does not require that a plaintiff prove that a harasser "intended" to

create a racially hostile environment.  Plaintiffs must establish that "the harassment was racial or

stemmed from racial animus."  *See Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994).  No

reasonable jury could conclude that a white supervisor's daily use of "nigger" to African

American subordinates was not "racial" and did not create a hostile work environment. *See*

*Abramson v. William Paterson Coll.*, 260 F.3d 265, 277-28 (3d Cir. 2001) (intentional

discrimination requirement "was not designed to protect harassers who fail to recognize the

hostile or abusive nature of their comments and actions" and only requires proof that harasser's

conduct was based on a protected category).  Facer used the terms "nigger" and "nigga" only in

reference to African American employees.  These facts demonstrate that Facer's conduct was due

to the Bratcher's race.  Moreover, the undisputed fact that Plaintiffs complained numerous times

placed Defendants on notice that the conduct was offensive and unwelcome.

     Defendants rely heavily on the fact that Facer thought he was friends with the Bratchers.

Facer's alleged misperception that his subordinates were not offended has no bearing on whether

his conduct subjected the Bratchers to a hostile work environment.  The test is whether a

reasonable person would have found the environment objectively hostile.  There is no case law

supporting Defendant's position that a supervisor's belief that he was friends with his

subordinates allows him or the employer to avoid liability for creating a hostile work

environment.

In addition, Defendants argue that the claims of other employees making racial slurs did

not create a hostile work environment because they were only few, isolated incidents.  Arrington

made one comment about "nigger rigging" but there is no evidence of it happening again.

Schade made an inappropriate comment to Buie about looking like a lawn jockey but it was a

one-time event and he did not believe it had racial animus.  Defendants also state that Pixton's

use of the term "nigger jig" was only said once.  But Defendants inappropriately attempt to parse

out incidents of harassment.  The Supreme Court has conclusively rejected Defendant's argument

that each incident may be parsed out and evaluated in isolation.  *National R.R. Passenger Corp.*

*v. Morgan*, 536 U.S. 101, 117 (2002) ("A hostile work environment claim is composed of a

series of separate acts that collectively constitute 'one unlawful employment practice.'")

Therefore, Arrington's "nigger rigging" comment, Schade's iron jockey comment, and Pixton's

"nigger jig" comment all contribute to the environment suffered by Plaintiffs even if any one of

these comments alone is not enough.

Applying the factors set out by the United States Supreme Court and Tenth Circuit to this

case, and viewing the evidence in a light most favorable to Defendant, no reasonable jury could

conclude that the Bratchers' and Buie's work environment was not "permeated with

discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to

alter the conditions of [their] employment and create an abusive working environment." *See*

*Tademy*, 614 F.3d at 1144.  This is a rare case where there is no dispute as to the pervasiveness of the conduct in question. No reasonable jury could find that a reasonable African-American would not be offended by this conduct.

### 2.  Subjectively Hostile Environment

The next question then turns on whether the Bratchers and Buie subjectively perceived their environment as hostile or abusive.  *See Harris v. Forklift Sys., Inc.*, 114 U.S. 367, 370 (1993). The undisputed facts establish that they made numerous complaints to management and coworkers, stating that they were offended.  As early as April 26, 2006, Antonio Bratcher complained in writing about racial harassment by a supervisor.  Antonio made clear in his written complaint that he was upset and offended that a white supervisor would use the word "nigger" in his presence, and in front of other white employees.  Later in his employment, Antonio also complained to the owner, Ron Holmes, about the way Facer was treating him.   Facer's response to Joby about Antonio's complaint demonstrates that Facer knew that Antonio was complaining about and trying to get him "in trouble for this nigger shit." It is undisputed that Joby Bratcher also complained to owner Ron Holmes sometime in 2007 about Facer's use of racial slurs, including use of the word "nigger."  In or around April 2008, Joby Bratcher again complained to owner Ron Holmes about Facer's daily harassment and use of the word "nigger" and racial jokes/comments.  Ron Holmes admitted that when Joby was complaining, he was clearly offended by Facer's conduct and just wanted the harassment to stop.

The Bratchers also told other employees, including supervisors, that they were offended by Facer's conduct.  For instance, it is undisputed that in November or December of 2007, the Bratchers complained to supervisor Steve Endo about Facer's racist comments and expressed to Endo that they were offended by Facer"s conduct. It is also undisputed that the Bratchers

complained to Kyle Doman, a white pipefitter welder helper, about Facer using the word

"nigger" or "nigga" towards them.  In July 2008, the Bratchers complained to PJ Facer, Paul

Facer's son, and told him that they were highly offended by PJ Facer's use of the term "nigger

nose."  The Bratchers also complained to Elizabeth Vargas, a Hispanic fire watch employee,

about a racist comment that was broadcasted over the two-way radios.  According to Vargas,

Antonio was "really mad" about the comment. It is also undisputed that the Bratchers

complained to Natalie Davis, a fire watch employee, about Facer's racial comments and repeated

use of the word "nigger" or "nigga" towards them.

It is also undisputed that the Bratchers complained to a white Chevron employee, Don

Brady, about the racial harassment at Holmes.  Antonio told Brady that he was upset about

someone calling him a "nigger" in front of the whole group of Holmes employees at a morning

meeting. It is undisputed that the Bratchers complained to Jesse Gehrke, a white pipefitter, and

Shad Pixton, a white pipefitter who supervised small crews for Holmes, about the "nigger

rigging" comment Dale Arrington made.  Several employees testified that the Bratchers and Buie

were visibly upset by this comment, and voiced their objections to the use of this type of

language.

Finally, the Bratchers again complained to owners Ron and Mike Holmes on August 20,

2008.  The Bratchers reiterated that they were offended by Facer's racial comments and felt that

the company was condoning his actions.  The evidence demonstrates that the Bratchers and Buie

complained about Facer's conduct and racial harassment on at least eleven separate occasions,

including multiple complaints to the owners and management.  In all of these complaints, the

Bratchers and Buie expressed that they were offended by the racial comments and wanted them

to stop.

Despite the abundance of undisputed evidence as to complaints the Bratchers and Buie made regarding the ongoing racial slurs and jokes, Defendants assert that the court cannot grant summary judgment on the subjective element of the hostile environment claim because there are credibility determinations that must be made by a jury. Defendants assert that there is evidence that the Bratchers participated in the conduct and referred to African Americans as "niggas" in their rap music outside of work.

Defendants contend that Facer's actions did not create a hostile work environment because Plaintiffs helped create the environment of which they now complain by going along with the slurs and using them as well. Facer testified that they would refer to him as their "nigger pa" and his son as their "little nigger" and "niglet." Other employees testified that the Bratchers would laugh at Facer's racial jokes. In addition, Defendants assert that the evidence demonstrates that the Bratchers were friends with Facer because they did things with each other outside the work place. Defendants assert that Facer did not use the terms as slurs but, rather, as terms of endearment.

First, the Bratcher's use of the word "nigga" outside the work place and in the context of their music is completely irrelevant to whether Defendants subjected them to a racially discriminatory hostile work environment. There is no evidence that any song by the Bratchers containing the word "nigga" was ever played in the workplace.

Similarly, the Bratchers' alleged use of the word "nigga" is irrelevant to whether Defendants' subjected them to racial harassment. The Seventh Circuit stated in a very similar case that "[t]he fact that black employees also may have spoken the term 'nigger' does not mitigate the harm caused by [the supervisor's] use of that epithet; a supervisor's use of the term impacts the work environment far more severely than use by co-equals." *Rodgers v. Western-*

20

*Southern Life Ins. Co.*, 12 F.3d at 675 (7th Cir. 2000).  The court agrees that Defendants cannot

blame the victims for the harassment inflicted upon them by Defendant's management.  Many

victims will attempt to alleviate the tension of the situation by merely going along with a

supervisor.  Such conduct would not be sufficient to override specific complaints that the

supervisor's conduct was unwelcome or offensive.

Defendants, however, argue that if the court looks at the totality of the circumstances, the

court cannot grant summary judgment on the subjective prong of the EEOC's hostile

environment claim.  Defendants point to evidence that some employees did not believe the

Bratchers were bothered by Facer's conduct because they were all friends and there was no real

animus behind the slurs.  There does appear to be some disputed facts as to whether there was

any kind of friendship between the parties.  The EEOC argues that out of the twenty-one

witnesses who testified in depositions, Defendants cite testimony from only three witnesses--

including Facer himself, a supervisor who continues to use the phrase "nigger rigging," and a

good friend of Facer's who has recently done work for him--to support their assertion that the

Bratchers used racial slurs at work, were friends with Facer, and did not mind Facer's conduct.

The evidence is so one-sided that the EEOC contends that Plaintiffs must prevail as a matter of

law.   While the court concurs that the evidence appears to be one-sided in favor of the EEOC,

the court cannot make a credibility assessment that discounts some witnesses' testimony because

those witnesses are friends with the alleged harasser.  Those witnesses testified that they do not

believe the Bratchers and Buie were subjectively offended by Facer's conduct.  A jury needs to

assess that testimony. On summary judgment, the court must consider all of the evidence and

view it in the light most favorable to the non-moving party.  Although there is significant

evidence that the Bratchers and Buie were offended by Facer's conduct, there is also some

limited evidence that they were not.  Accordingly, the court concludes that it cannot grant

summary judgment in favor of the EEOC on the subjective element of its hostile environment

claim.

**B.  Employer's Liability**

The EEOC argues that Holmes and its owners, Ron and Mike Holmes, are liable for the

racially hostile work environment because they knew or should have known about the

environment that existed at Holmes.  Employers are not automatically liable under Title VII for

the acts of their employees.  *Tademy*, 614 F.3d at 1139.  However, "since the employer ultimately

controls the conditions of the work environment[,]" the Tenth Circuit has held that "[a]n

employer who condones or tolerates the creation of [a hostile work] environment should be held

liable."  *Id.*  In the Tenth Circuit, employers may be held liable for the conduct of their

employees under three theories: (1) the negligence theory; (2) the actual authority theory; and (3)

the apparent authority theory (vicarious liability).  *Tademy*, 614 F.3d at 1139.  The EEOC argues

that it is undisputed that Defendants had both actual and constructive knowledge of the hostile

work environment and are liable under either negligence or vicarious liability.

**1.  Negligence Theory**

An employer may be held liable for its employees' racially harassing conduct if it knew or

should have known about the conduct and failed to respond in an appropriate manner.  *See*

*Wright-Simmons v. The City of Oklahoma City*, 155 F.3d 1264, 1270 (10th Cir. 1998).  The

EEOC argues that the company and its owners are liable for negligence in tolerating and/or

condoning a racially hostile environment because the Bratchers and Buie complained at least

eleven different times and no appropriate action was ever taken.

At least four complaints were made to management level employees.  On April 26, 2006,

Antonio Bratcher complained about the use of the word "nigger" to his then-supervisor Clayton Firth.  Antonio also complained to Ron Holmes regarding Facer's treatment.  While it is unclear how specific Antonio was in that complaint, Facer responded to Joby that Antonio was trying to get him in "trouble for this nigger shit."  Joby Bratcher complained to Ron Holmes on at least two occasions in 2007 and 2008.  The Bratchers also complained to Steve Endo, who was a management level employee, in November or December 2007, although he did not apparently have a direct supervisory position over the Bratchers.

With respect to evidence as to constructive knowledge, Ron Holmes admitted in his deposition that he should have known about Facer's conduct given how often he visited the work site.  Both owners also admitted that they would not be surprised if Facer used the word "nigger" loosely at the job site.

The evidence demonstrates actual or constructive notice of the racially hostile environment.  The issue, therefore, is whether Defendants responded in an appropriate manner.  The touchstone for evaluating an employer's response is reasonableness.  *Bertsch v. Overstock.com*, 2011 WL 2117615 at *6 (D. Utah May 27, 2011).  This is the main dispute between the parties.  The EEOC charges that Defendants took no action for two years and when they finally did, the investigation was not done correctly and action was taken only after Facer self-terminated his employment because he refused to take a drug test.  Defendants, however, argue that the allegation that Plaintiffs made eleven complaints is misleading because many were not made to management-level employees.  Defendants claim that the only undisputed evidence regarding Defendants' actual knowledge is that Joby complained to Ron Holmes in April 2008, the Bratchers complained to Ron Holmes during the August 20, 2008 meeting, and the Bratcher's and Buie complained about Arrington's comment. Defendants contend that their responses to

each of these complaints were reasonable.

Holmes testified that when Joby complained in April 2008, he spoke to Facer that day and asked him to stop the conduct immediately and to apologize. He claims that Facer reported back that he had apologized. Ron Holmes also claims that in addition to verbally reprimanding Facer, he instructed Arrington to monitor the situation to make sure it was resolved. In response to Arrington's comment, Holmes testified that Arrington admitted the conduct to him and admitted that he had screwed up. Holmes testified that he verbally disciplined Arrington and had Arrington apologize to the Bratchers and Buie.

With respect to the August 20, 2008 meeting, Defendants state that Plaintiffs raised the issue of racial harassment in a meeting regarding potential drug use at the Chevron work site. In response to these claims, Defendants contend that they had Arrington look into these allegations by talking to some employees. While Arrington may have spoken to some employees, Defendants admit that he did not speak to Facer about the claims. On the day of the meeting, Facer refused to take a drug test and walked off the job, in essence self-terminating his employment with Holmes. Joby Bratcher also self-terminated his employment that day for refusal to take a drug test. Antonio Bratcher was laid off with other employees for lack of work. The EEOC claims that Holmes discontinued its investigation into the racial harassment because Chevron revoked its contract in August 2008. Holmes, however, claims that despite the interruption caused by the loss of the Chevron contract, it completed its investigation.

Arrington's investigation concluded that the Bratchers had been racially harassed. On August 21, 2008, Facer was given a 30-day corrective action for racial slurs and then a 120-day suspension for failure to take the drug test and racial slurs. The EEOC claims that the two corrective actions issued to Facer were to give the illusion of remedial action. However, Facer

was not issued either of these before he self-terminated for refusing to take a drug test.

Defendants admitted that if Facer had not self-terminated, Facer would have remained employed

but been on "very tight strings."  Facer, in fact, returned to work for Holmes 120 days later, but

he was demoted to a pipe fitter rather than a superintendent and was paid $15 less an hour.  It is

not clear whether this demotion was in response to the racial discrimination complaints.

By admitting to four complaints to management level employees, the EEOC argues that

Defendants have conceded that they had actual knowledge of the racially hostile work

environment yet Defendants do not demonstrate any reasonable responses or investigations into

the complaints.  In most instances, Ron Holmes merely spoke to the alleged harassers and told

them to apologize.  With respect to the last investigation, Facer was never even spoken to about

the complaints and it was concluded after Facer had self-terminated his employment.  The EEOC

contends that these responses to complaints of egregious racial harassment are unreasonable as a

matter of law.

The Tenth Circuit has stated that "[w]here the response is not effective, we examine the

timing of the employee's complaint, the speed of the employer's response, and the gravity of the

punishment relative to the alleged harassment." *Duncan v. Manager Dept. of Safety, City and

County of Denver*, 397 F.3d 1300, 1310 (10th Cir. 2005).  Defendants do not appear to have

delayed with respect to the complaints.  But the gravity of the punishment relative to the alleged

harassment is questionable.  While little was done in response to the Bratcher's complaints, the

court concludes that it cannot determine whether the responses were unreasonable as a matter of

law.  A jury should weigh the evidence and determine reasonableness.  Accordingly, the court

declines to find negligence as a matter of law.

### 2.  Vicarious Liability

Even if Defendants are not liable on a negligence theory, the EEOC argues that the vicarious liability standard provides another basis for liability.  If vicarious liability is the basis for liability, the affirmative defense under *Faragher/Ellerth* could become available to Defendant.

"An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate authority over the employee." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).  When no tangible employment action has been taken, a defending employer may raise an affirmative defense to liability or damages.  *Id.*  That defense, however, is comprised of two necessary elements: (1) the employer exercised reasonable care to prevent and correct promptly any racially harassing behavior; and (2) the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities.  *Id.*

The Bratchers complained on numerous occasions, at least four undisputed times to management.  Thus, the second element is not met.  "The defense is lost if the evidence is insufficient to support either prong."  *EEOC v. Donahue Cardiology Assocs.*, 2011 WL 4572020, at *20 (W.D. Pa. Sept. 30, 2011).  Therefore, the court need not consider the rest of the analysis as Defendant cannot establish the second element.

Even if the court were to consider whether the Defendant exercised reasonable care to prevent the harassing conduct, it is well established that the mere institution of a policy alone is not sufficient to satisfy the first prong of the affirmative defense.  In this case, Holmes' policy does not mention race or racial harassment and does not provide an avenue to bypass a harassing supervisor when making complaints.  Holmes' policy reads only that an individual who feels that

he or she has experienced or witnessed harassment "is to immediately notify his/her supervisor."

"A policy against harassment that includes no assurance that a harassing supervisor can be

bypassed in the complaint process is unreasonable as a matter of law." *EEOC v. V & J Foods,*

*Inc.*, 507 F.3d 575, 579 (7th Cir. 2007); *see also Clark v. United Parcel Serv.*, 400 F.3d 341, 349-

50 (6th Cir. 2005).  As a matter of law, Holmes' policy is unreasonable as a matter of law because

it directs victims to report discrimination to their harassing supervisor and provides no alternative

means to bypass that supervisor.  Therefore, Defendants are not entitled to the *Faragher/Ellerth*

defense.

### Defendants' Motions for Sanctions

Defendants seek the sanction of dismissal based on their assertion that the Bratchers

provided false testimony regarding their relationship with Paul Facer.  Defendants argue that the

Bratchers' relationship with Facer has a direct impact on the merits of this case, including

whether they subjectively believed they were subjected to a hostile work environment.  The

Bratchers deny that they were friends with Facer while Facer testified that he considered them

friends.  There is evidence that Facer and the Bratchers did certain activities outside of work.

Despite the Bratchers' testimony that they felt obliged to engage in these outside events and that

they did not consider Facer a friend, Defendants contend that the Bratchers engaged in wilful

perjury warranting the dismissal of their claims.

In this case, Defendants argue that Pixton testified that the Bratchers and Facer had a

personal relationship where they went to concerts, went boating, and talked about what they did

over the weekend.  Pixton testified that the Bratchers invited Facer to the creation of their music

video, the Bratchers used Facer and other Holmes employees as extras in the music video, Facer

invited the Bratchers to come to his daughter's birthday party, and the Bratchers invited Facer to

their recording studio on several occasions.  There are also photographs memorializing a boating trip the Bratchers took with Facer.

The main problem with Defendants' motion is that the phrase "personal relationship" or term "friend" are relative and cannot serve as a foundation for perjury.  The Bratchers' personal belief that there were not "friends" with the man who allegedly harassed them cannot constitute perjury.  Defendants appear to interpret the term personal relationship to mean whether Facer and the Bratchers ever did anything together outside of work.  However, the phrase could also be interpreted as whether you wanted to do something with someone outside of work.  The phrase "personal relationship" and, even more so, the term "friends" cannot be objectively determined in this context.

For example, Joby acknowledged that he went to Facer's daughter's birthday party.  Joby testified that he did not believe this meant he had a personal relationship with Facer.  He explained that he did not want to attend the party but he attended the birthday party because his wife believed it might ease the hostile environment at work by humanizing Joby in Facer's eyes. Antonio also testified that he did not consider himself a friend to Facer even though he bought a boat from him and went on a boating trip with him to test drive the boat.  The purpose of the boat trip was to take the boat for a test drive because Antonio was interested in buying it.   Even if the Bratchers had fun on the boat trip, it does not mean that they had a personal relationship or became friends with Facer.

The fact that the parties had interactions outside of work does not indicate that the relationship was friendly.  The Bratchers  testified that Facer attended one of their concerts that was part of a car show.  Joby testified that he did not invite Facer and Facer told him he was there to look at the cars.  Joby also testified that Facer told him he was going to leave because there

were too many "niggers and spics" there.  Joby also testified that he left Facer's daughter's birthday party after only 30 to 40 minutes because Facer's mother made a derogatory racial remark about his child.  Paul Facer's son corroborated Joby's testimony about the party.  There are a myriad of reasons why a subordinate may feel obligated to have interactions outside work with a supervisor.  These interactions do not mandate a finding that the men were friends.

The Bratchers fully testified as to each of the events Defendants rely upon. None of this evidence supports the conclusion that the Bratchers are lying when they give their opinions that they did not have a personal relationship with Facer and did not consider him a friend.  These are not objective questions that can form the basis for perjury.  Pixton's testimony that Facer and the Bratchers were friends is merely his opinion.  Each witness is entitled to his or her own opinion on such matters.

While there is no basis for finding perjury as to a subjective term such as friendship, Defendants also appear to ask this court to determine which party is more accurate on underlying facts with respect to interactions outside work.  Joby testified that he could not remember one way or the other whether Facer's motorcycle was used as a prop in his music video.  Joby also explained that he did not invite Facer to the shoot and did not recall seeing him there.  He explained that there were about a thousand people there.  Even if there is a dispute as to an underlying fact that could be objectively proven, there is no basis for the court to determine which party may be more truthful.  A jury can determine whether a party truthfully remembers something.  Such disputes are not the basis for alleging perjury and the court finds the motion highly unusual.

Similarly, Defendant Paul Facer's joinder in Defendants' Motion for Sanctions alleges that Joby Bratcher has committed perjury in relation to work he performed for his brother-in-law

in Oregon.  However, again, Joby testified that he considered the money he was paid by his

brother-in-law to be a loan that he intends to pay back.  Joby did not tryt o hide the fact that he

had performed this work and he fully testified in his first deposition that he perceived the money

to be a loan.  The court routinely sees these types of factual disputes between parties and they are

to be weighed by a jury.  They do not form the basis for an allegation of perjury.

The court concludes that Defendants' motion is wholly without merit.  The court is more

inclined to sanction Defendants' for bringing the motion than it is to grant the motion.  The court

discourages such aggressive litigation tactics as they are a waste of the parties' and court's time

and resources.  The fact that Facer and Pixton dispute the Bratchers' testimony does not mean

that the Bratchers are lying any more than it means that Facer and Pixton are lying.  There is

significant evidence from multiple witnesses that the Bratchers were repeatedly offended by

Facer's conduct.  Accordingly, Defendants' motion for sanctions is denied.

## Defendants' Motion in Limine re: Music Lyrics and Videos

Defendants ask the court for a ruling that the Bratchers' music lyrics and music videos are

admissible as relevant to whether the Bratchers subjectively perceived the work site as offensive.

The Bratchers use the term "nigga" repeatedly in their rap music.  Of their 61 songs, they use the

term in 39 songs.  Defendants argue that the Bratchers would play their music at work and bring

CD's and unreleased material from their studio for other employees.  The Bratchers would also

invite other employees to their concerts.  Defendants argue that if the Bratchers use the same

language they now complain is offensive, then it is only fair that Defendants be allowed to show

these lyrics at trial.

Whether the Bratchers used the word "nigga" outside the workplace in a creative context

is completely irrelevant to whether Defendants subjected them to an unlawfully hostile work

environment.  There is actually no evidence that the Bratchers ever played any songs with any reference to race or the word "nigga" inside the workplace.  Numerous witnesses testified that they never heard any of the Bratchers' music in the workplace.  The few that did allegedly hear the music did not hear any reference to race at all.  There is no evidence that Antonio's music was ever played at the work site.

Defendants predicate their argument that these lyrics are relevant on testimony establishing only that other employees played Joby's music in the workplace.  This is too tenuous, especially given the lack of evidence that anyone at the work site ever heard any racial statement in the music.  Given this inability to establish even a tenuous connection between the proffered evidence and Plaintiffs' claims, it is inadmissible at trial.  There is also no evidence that the music videos were ever played at the work site.  The court concludes that the evidence in this case precludes the admission of the music lyrics and videos.

Moreover, the Bratcher's use of the word "nigga" in their artistic endeavors does not mean that they were not subjectively offended when their white supervisor called them "nigger" at work.  The issue in this case is not whether the Bratchers used the word "nigga" in their music outside of work.  The issue is whether the Bratchers personally perceived their work environment to be hostile or abusive.  Even if the Bratchers used the word "nigga" in the workplace, which has not been established in this case, it cannot be said that their music lyrics and videos, which only involve artistic conduct outside of work, is relevant to the analysis.

The Bratchers' conduct outside of work is not a relevant factor that could eliminate their legal protections against unwelcome harassment at work.  Several courts have made this point in the context of sexual harassment.  *See EEOC v. Wal-Mart Stores, Inc.*, 1999 WL 1032963, at *3 (10th Cir. Nov. 15, 1999) (holding plaintiff's sexual relationship with coworkers outside work is

not relevant to plaintiff's claims of harassment at work); *Winsor v. Hinckley Dodge, Inc.*, 79 F.3d

996, 1001 (10th Cir. 1996) (holding that "a person's private and consensual sexual activities do

not constitute a waiver of his or her legal protections against unwelcome and unsolicited sexual

harassment."); *Burns v. McGregor Electronics Indus., Inc.,* 989 F.2d 959, 961-63 (8th Cir. 1993)

("The plaintiff's choice to pose for nude magazines outside work hours is not material to the

issue of whether plaintiff found her employer's work related conduct offensive.").  Nothing in the

Bratchers' music lyrics or videos makes it any more or less likely that they found their work

environment subjectively hostile when their white supervisor repeatedly used the term "nigger"

to address them at work and they complained about it.

Furthermore, even if the court were to find the music lyrics or videos marginally relevant

to the issues in this case, any slight probative value is substantially outweighed by the danger of

unfair prejudice and confusion of the issues under Rule 403 of the Federal Rules of Evidence.

Rap lyrics contain a significant amount of crude language and words that could be offensive to

many members of the jury while there is no evidence that the Bratchers used this kind of

language at work.  This case is not about rap music.  There is also another Plaintiff, James Buie,

who had nothing to do with the Bratchers' rap music.  Confusion and prejudice would clearly

color his claims.  Accordingly, the court also finds that the music lyrics and videos are

inadmissible under Rule 403.  Therefore, Defendants' Motion in Limine Regarding Plaintiffs'

Music Lyrics and Videos is denied.

## CONCLUSION

Based on the above reasoning, Plaintiff EEOC's Motion for Partial Summary Judgment is

GRANTED IN PART AND DENIED IN PART as explained above; Defendants' Motion for

Sanctions is DENIED; and Defendants' Motion in Limine Regarding Plaintiffs' Music Lyrics

and Videos is DENIED.

DATED this 10th day of October, 2012.

BY THE COURT:

Dale A. Kimball,
United States District Judge